### IN RE: BLOOD REAGENTS ANTITRUST LITIGATION

**This Document Relates To: All Actions**

**MDL NO. 2081**
**MASTER FILE NO. 09–MD–2081**

United States District Court,
E.D. Pennsylvania.

Filed July 19, 2017

---

752

---

## MEMORANDUM

DuBois, District Judge

### TABLE OF CONTENTS

I. INTRODUCTION...754

II. BACKGROUND...754

 A. Factual Background...755

 B. Creation of a Duopoly...756

 C. 2001 Price Increase...756

 1. Shift to Blood Bank Leadership Program...757

 2. Alleged Price–Fixing Conspiracy...757

 D. 2005 Price Increases...759

 1. Price Increases...759

 2. 2004 GPO Contract Cancellations...762

 E. 2008 Price Increase...762

 F. Evidentiary Issues...764

 1. Parties' Statements...764

 2. Co–Conspirator Statements...764

III. Procedural History...764

IV. Applicable Law...766

 A. The Matsushita Standard...766

 B. Analyzing Evidence at the Summary Judgment Stage...768

V. Discussion...768

 A. Per Se Standard—Rule of Reason Standard...769

 B. Parallel Conduct—2005 and 2008 Price Increases...769

 C. Motive to Enter· into Conspiracy...772

 D. Actions Contrary to Interest...772

 E. Pretextual Explanations...774

 F. Evidence Implying a Traditional Conspiracy...775

 1. 2001 Price Increase...775

 2. 2005 Price Increase...778

 3. 2008 Price Increase...782

 G. "Plus Factors"—Conclusion...783

 H. Fraudulent·Concealment...784

 1. Applicable Law...784

 2. Discussion...784

 a. Awareness of Facts Supporting Claim...784

 b. Reasonable Diligence...786

VI. Conclusion...787

## I. INTRODUCTION

In this multidistrict litigation consolidating thirty-three separate civil antitrust actions, plaintiffs, purchasers of traditional blood reagents ("TBRs") allege that defendants, the two leading producers of blood reagents—Ortho–Clinical Diagnostics, Inc. ("Ortho") and Immucor, Inc. ("Immucor")—conspired to unreasonably restrain trade and commerce in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. In September 2012, plaintiffs and Immucor reached a settlement. Ortho is the sole remaining defendant. Presently before the Court is Ortho's Motion for Summary Judgment. For the reasons that follow, the Court denies in part and grants in part Ortho's Motion.

## II. BACKGROUND

Between 2000 and 2009, Ortho and Immucor drastically increased the prices of

their blood reagent products—some product prices increased 20 fold. Resp. to Mot. for Summ. J., Ex. 1, Corrected Rep. of John C. Beyer, Ph.D. Regarding Liability and Damages ("Beyer Aug. Rep."), Aug. 14, 2012, ¶ 28. The parties agree that some part of this increase resulted from the elimination of all firms in the blood reagents market except for Ortho and Immucor by 1999, and the resulting market power of those two firms. However, plaintiffs allege that an unlawful horizontal price-fixing agreement between Ortho and Immucor, beginning in November 2000, resulting in more than $650 million in market overcharges to plaintiffs and class members.

## A. Factual Background

Blood reagents are used to identify properties of human blood. Most large purchasers of blood reagents are blood donor centers and hospitals, which use them to test whether the blood of a potential donor is compatible with the blood of a potential recipient. Mot. for Summ. J, Ex. 15, Report of Teresa Harris ("Harris Rep."), ¶¶ 6–8. Under applicable Food and Drug Administration ("FDA") regulations, Blood Bank and Transfusion Standards promulgated by the American Association of Blood Banks ("AABB"), and other rules, blood donor centers must test a donor's ABO group (blood classification based on the inherited properties of red blood cells) and Rh type and perform an antibody screen each time he or she donates. Harris Rep. ¶ 20. Hospitals must conduct similar tests on a recipient before providing a blood transfusion. Id. ¶ 7.

There are two basic categories of blood reagents: traditional and automated. Although Ortho and Immucor sold products in both categories throughout the class period, the class in this case includes only purchasers of TBRs. When using TBRs, laboratory technicians test blood manually in test tubes and interpret the results. Id. ¶ 14. "Automated" or "proprietary" blood reagents ("ABRs"), on the other hand, are often used with specialized equipment. Id. ABRs allow for quicker testing while requiring less skill and decreasing the risk of technician error but tend to be more expensive than TBRs. Resp., Ex. 27, Declaration of Bill Weiss ("Weiss Decl."), ¶ 14.

From 2000 to 2010, Ortho and Immucor each sold more than forty different TBR products. Harris Rep. Ex. C. A list provided by plaintiffs' industry expert, Teresa Harris, shows that most Ortho TBR products had an equivalent Immucor TBR product, and vice versa. Id. Harris opines that, while some are nonidentical pairs, the nonidentical pairs "perform exactly the same function." Resp., Ex. 11, Reply Report of Teresa Harris ("Harris Reply") Ex. B, ¶ 3.

For much of the period between 2000 and 2009, Ortho and Immucor remained the sole producers of TBRs because the market was difficult to enter. New entrants into the TBR market faced a prolonged FDA licensing process. Resp., Ex. 21, Declaration of Mike Poynter ("Poynter Decl."), ¶ 26. Ed Gallup, the Chief Executive of Immucor from 1982 until 2003,[1] addressed what he believed to be the significant barriers to entry in a 2002 interview with *The Wall Street Transcript.* SOF ¶¶ 117–19. In regard to potential competition, Gallup stated that "[i]t took the last company that applied six years to receive a FDA establishment license in this industry" and branded FDA licensing as a "fairly large barrier to entry." SOF ¶ 119. Similarly, John Kingsbury, Director of Sales and Marketing for Ortho from

---

1. Gallup served as Immucor's Chairman, President and CEO from 1982 through 2003. Mot. for Summ. J., Ex. 59, Deposition of Ed Gallup ("Gallup Dep."), 8:10–18. He remained Chairman of Immucor until 2006. Id.

1996 through 1999, testified that FDA regulations made Ortho's blood bank business, including TBRs, "more complex to operate in, more time consuming, more costly, etc." Pls. SOF ¶ 51. In 2008, two new TBR producers, Alba Bioscience and Biotest, overcame those barriers and joined Ortho and Immucor in the market. SOF ¶¶ 565–70.

## B. Creation of a Duopoly

In the 1980s and 1990s, the TBR industry was highly competitive. Pls. SOF ¶ 24. In the fifteen to twenty years prior to 2003, there were as many as fourteen competitors in the market. Pls. SOF ¶ 27. As a result, prices steadily decreased and profitability diminished. Pls. SOF ¶ 24. Immucor was near bankruptcy, with shares trading for pennies, while Ortho considered leaving the TBR market entirely. Pls. SOF ¶ 30.

To increase profitability, Immucor embarked on a campaign to eliminate competition in the blood reagents industry during the 1990s. SOF ¶ 113. Between 1997 and 1999, Immucor acquired three TBR suppliers in North America—Gamma Biologicals, Inc., Dominion Biologicals, Ltd., and the BCA blood bank division assets of Biopool International, Inc. SOF ¶ 114. By April 30, 1999, Ortho and Immucor were the sole remaining suppliers of TBRs in the United States. SOF ¶ 115. Immucor publicly acknowledged that the acquisitions were designed to eliminate competition. SOF ¶ 116.

By the close of Immucor's acquisition program, the Herfindahl–Hirschman Index ("HHI"), a measure of the concentration in the TBR market, was approximately 5,000. SOF ¶ 123. HHI is calculated by squaring the market share of each firm competing in a market, and then adding the resulting numbers. HHI can range from close to zero to 10,000. The United States Department of Justice ("DOJ") and Federal Trade Commission ("FTC") consider a market with an HHI higher than 2,500 highly concentrated. SOF ¶ 122–23. According to the DOJ and FTC's Horizontal Merger Guidelines, market concentration can increase prices absent any collusion between competitors. SOF ¶ 124. Ortho and Immucor soon took advantage of this newly concentrated TBR market in 2000, instituting the first price increase on TBRs in the United States since 1982. Pls. SOF ¶ 25.

## C. 2001 Price Increase

The first price increase implemented by Ortho was part of its newly developed strategy, named Operation Create Value ("OCV"), designed with the assistance of an outside consulting firm. SOF ¶¶ 127, 129. Ortho began work on OCV at least as early as October 1999. SOF ¶ 127. The OCV development team modeled three different scenarios based on whether Immucor followed an Ortho price increase immediately, followed after a year, or did not follow at all. SOF ¶ 135. After evaluating the potential loss of TBR sales volume under each of these scenarios, the OCV team recommended two annual price increases of 25% each. SOF ¶¶ 137–39, 145. The first 25% price increase was scheduled for 2000, the second 25% price increase was set to take effect in 2001, and additional increases after 2001 were anticipated until "profitability was achieved." SOF ¶ 146. Ortho's first 25% increase was announced to customers in a March 14, 2000, letter and first went into effect for some customers on April 1, 2000. SOF ¶ 147–48.

Following Ortho's price increase, Immucor increased TBR prices by 20% for some customers in June 2000. SOF ¶¶ 151–52. Soon after initiating the June price increase, Immucor issued a press release on July 31, 2000, stating that "regional managers will focus their efforts equally on the placement of instruments and the improvement of margins through price increases

for our [TBR] business." SOF ¶ 156; Mot. for Summ. J., Ex. 129, Email from M. Esposito re: Immucor Press Release, 2. Following this initial price increase by both Ortho and Immucor, as of September 5, 2000, less than two percent of Ortho's non-group customers whose contracts had expired between January and August switched to Immucor in response to Ortho's OCV price increase. SOF ¶ 157. Plaintiffs do not allege that the price increase in 2000 was a result of collusion.

### 1. Shift to Blood Bank Leadership Program

In the fall of 2000, Ortho began consideration of a larger single price increase in 2001 in lieu of the planned 25% increase. SOF ¶¶ 158, 162–63. This new strategy, the Blood Bank Leadership Plan ("BBLP"), significantly increased the price of TBRs. SOF ¶ 169. Under the previously planned 25% increase, Ortho determined that its standard gross profit margin would be negative fifteen percent. SOF ¶ 162. However, under the BBLP with its larger proposed increase, Ortho's standard gross profit margin was projected to improve to negative four percent. SOF ¶ 163.

By at least October 30, 2000, Ortho developed a new price list for 2001. SOF ¶ 173. Although the price increase per account varied, the accounts identified by Ortho that only used TBRs experienced increases of 135% to 202% under the new plan. SOF ¶ 169; see also Mot. for Summ. J, Ex. 6, OCD Blood Bank Leadership Program Traditional Blood Bank Market Correction Plan ("BBLP Corr. Plan"), November 15, 2000, 10. Ortho product prices increased by anywhere from $7.07 ($10.97 to $18.04) to $195.98 ($251.74 to $447.72). Id. at 11. On November 21, 2000, Ortho mailed a letter to 138 of its distributors, 180 of its federal government accounts, and nine of its "pilot" customers announcing the 2001 price increase and attached its 2001 TBR price list. SOF ¶¶ 185–86.

### 2. Alleged Price–Fixing Conspiracy

Plaintiffs allege that Ortho and Immucor began to engage in unlawful pricing-related communications in November 2000, prior to Ortho's mailing of its 2001 price list. The first major event occurred at an annual American Association of Blood Banks ("AABB") trade meeting. The AABB is an accreditation entity for blood banks. SOF ¶ 95. It holds annual meetings, attended by customers including healthcare professionals. SOF ¶ 96–97. In 2000, AABB held its annual meeting in Washington, D.C. from November 4 through November 8. SOF ¶ 190. Ortho personnel, including then-acting Ortho president Catherine Burzik, and Immucor employees attended the 2000 meeting. SOF ¶¶ 191–93. As was customary, both Ortho and Immucor sponsored booths at the meeting. SOF ¶ 198–99.

At the 2000 meeting, Immucor's President, Ed Gallup, viewed a presentation at Ortho's booth, during which Ortho announced it was going to leave the TBR business or "dramatically" increase prices. SOF ¶ 204; Pls. SOF ¶ 92. Gallup stated that he watched Ortho's presentation twice to "make sure [he] didn't miss anything." Pls. SOF ¶ 92. Judy Thorne, Immucor Director of Marketing, also left with the impression that Ortho was going to institute a significant price increase. Pls. SOF ¶ 88; SOF ¶ 205. Thorne later testified that "Ortho made a public announcement they would be raising prices significantly. This industry had never seen a price increase in probably ten years. I kept telling Ed [Gallup] and Mike [Poynter] we need to raise prices .... And Ortho made an announcement that they were going to raise prices and so Gallup asked me if I could meet with a friend of mine to find out a range of where Ortho may be considering putting the pricing." Pls. SOF ¶ 94. Several other Immucor employees likewise understood that Ortho's pricing would in-

crease based on Ortho's presentation. Mot. for Summ. J., Ex. 94, Deposition of Irene DeMezzo ("DeMezzo Dep."), 87:9–89:3. However, no Immucor employees heard Ortho announce a price increase in specific dollar or percentage terms at that presentation. SOF ¶ 206.

According to Mike Poynter, Immucor Vice President of Sales, Burzik, Ortho's President, allegedly approached him during the AABB meeting, asked if he had viewed Ortho's presentation, and invited him to Ortho's booth. Pls. SOF ¶ 95. According to Poynter, Burzik told him that "she had recently joined Ortho, that Ortho's margins on [TBR] were terrible, and that she wanted to understand the margin situation regarding [TBR]." Pls. SOF ¶ 96. She left her business card with Poynter and requested that he give it to Gallup "because she wanted to speak to him." Pls. SOF ¶ 97. Poynter subsequently delivered the business card to Gallup and "conveyed [Burzik's] request to speak with him." Pls. SOF ¶ 98. Poynter was "uncomfortable" with the Burzik exchange and believed it "was not proper protocol between competitors." Poynter Decl., ¶ 8. Burzik disputes this account and claims she never met Poynter. Mot. for Summ. J., Ex. 8, Deposition of Catherine Burzik ("Burzik Dep."), Feb. 7, 2012, 168:6–10.

At the same 2000 AABB meeting, David Gendusa, an Ortho Regional Vice President and part of the OCV implementation team, was asked to introduce a high-ranking Ortho executive to Gallup at the Immucor booth. Pls. SOF ¶¶ 103, 100. Gendusa did so but left the booth as the two individuals were speaking and does not remember the identity of the Ortho executive. Pls. SOF ¶ 100. Although Gendusa cannot recall who he introduced to Gallup, he characterized the meeting as follows: "[y]ou are in a very public appearance, and for the two presidents of a company to get together just to say hello, it's kind of a civilized thing to do." Resp., Ex. 83, Deposition of David Gendusa ("Gendusa Dep."), May 30, 2012, 152:16–22.

Shortly after the 2000 AABB meeting ended, Gallup asked Thorne to meet with Gendusa, a friend of hers, to "find out a range where Ortho may be considering putting the price." Resp., Ex. 93, Dep. of Judy Thorne in Employment Case ("Thorne Empl. Dep."), July 1, 2004, 206:8–12. Thorne stated that it "was a tough one for [her] ... from an ethical standpoint." Id. at 206:15–16. She thought that "legally it was probably on the edge and [ ] was a little concerned about it." Id. at 206:16–18. Nonetheless, she contacted Gendusa by telephone on or before November 15, 2000. Pls. SOF ¶ 105. During the call, Thorne asked Gendusa to meet for lunch to "discuss pricing strategy for Ortho" and how high the Ortho prices might be. Resp., Ex. 91, Dep. of Judy Cangiamilla ("Thorne Dep."), February 9, 2012, 41:14–25. Thorne also conveyed Gallup's concern that Ortho might be trying to trick Immucor into raising its prices. Gendusa Dep. 171:5–16. In response, Gendusa expressed disbelief that Gallup would think the price increase announcement was a fraud. Id. at 171:17–22.

Following the telephone conversation, Thorne sent Gallup an email on November 15, 2000, with the subject line "Spoke to my friend." Resp., Ex. 94, Email from Thorne to Gallup ("Thorne–Gallup Email"). In the email, she wrote, "My friend called me back ... let me know when you are done." Id. On November 15, the same day as Thorne's telephone call, an Ortho presentation listed the first risk of the BBLP price increase as "Immucor does not follow aggressively." Pls. SOF ¶ 168. Two days after the telephone call, a revised Ortho presentation concerning the BBLP price increase omitted Immucor not following the increase as a risk. Pls. SOF

¶ 170. The same day as the revised presentation was given, Poynter sent an email to an individual not employed by Immucor or Ortho, writing, "[w]e are going to increase prices around the first of the year so look out. We are going to piss off a lot of people, but Ortho is going to do the same!!!" Resp., Ex. 95, Email from Poynter to Marty Getz ("Poynter–Getz Email").

On November 21, 2000, Thorne and Gendusa met for lunch at a restaurant. Pls. SOF ¶ 111. Gendusa brought Ortho's TBR price list to the lunch meeting. Pls. SOF ¶ 113. Thorne asked Gendusa "if he could share the Ortho pricing with [her] because [she] really wanted to understand . . . how high the prices would be with Ortho." Thorne Dep. 42:20–24. Gendusa appeared reluctant, and Thorne discussed the importance of Immucor gaining Ortho's price information. Id. at 42:24–43:7. Gendusa testified that he "reached into [his] briefcase, [he] took the price[ ] [list] out and [he] shook them in front of her." Pls. SOF ¶ 115. Thorne states that Gendusa showed her the price list in his briefcase. Pls. SOF ¶ 115. Thorne wrote down prices for the top five to seven "buckets" of TBRs once she returned to her vehicle. Pls. SOF ¶ 116; Thorne Dep. 82:4–83:17.

Following the lunch, Thorne returned to the Immucor office and gave Gallup the copied price information. Pls. SOF ¶ 117. When Thorne asked Gallup how to expense her lunch, Gallup told her to expense the meal as if she had eaten with him instead of Gendusa. Pls. SOF ¶ 118; Thorne Dep. 46:4–10. As for Ortho, Gendusa stated that he cannot recall informing anyone at Ortho about the meeting but if he told anyone, he would have told John Kingsbury, an Ortho executive. Gendusa Dep. 213:24–214:8. The same day as the lunch, Ortho sent its price increase letter and finalized price list to distributors, 180 of its federal government accounts, and nine of its "pilot" customers. SOF ¶ 186. A

day later, on November 22, 2000, Ortho emailed the documents to other customers. Pls. SOF ¶ 122.

Immucor's pricing shifted course following the 2000 AABB meeting. Prior to the meeting, Immucor considered a 20% price increase for its TBRs. Pls. SOF ¶ 147. After the meeting, Immucor changed its plans to call for a "significant" price increase of "much higher" than the previously targeted 20%. Poynter Decl. ¶ 13. On December 1, 2000, an Immucor salesperson obtained a copy of Ortho's 2001 TBR price list from a customer. SOF ¶ 247. Poynter, Weiss, and Gallup met at Immucor's headquarters on December 2 to review the price list. SOF ¶ 249. On December 5, 2000, Immucor announced its 2001 TBR price increases to customers. SOF ¶ 256. Immucor's prices were roughly 5–10% below Ortho's prices. SOF ¶ 260. By the end of May 2001, Gallup wrote to the future Immucor President Nino De Chirico that Immucor's "biggest wild card is Ortho must continue to hang tough on pricing. [Immucor has] no indication [Ortho is] caving in." Pls. SOF ¶ 186.

### D. 2005 Price Increases

Plaintiffs allege that the November 2000 communications initiated a lengthy conspiracy to impose substantial price increases on TBRs during the class period. While prices rose somewhat between 2002 and 2004, Beyer Aug. Report, figs. 1–4, the next major price-increase initiative was implemented in 2005, Id. ¶ 28. At that time, both firms increased the prices of their TBR products significantly. Ortho and Immucor also cancelled contracts in 2004 with important group purchasing organizations ("GPOs") in order to implement the new price increases.

#### 1. Price Increases

On October 27, 2003, Nino De Chirico, who succeeded Gallup as Immucor President in 2003, emailed Roy Davis—Com-

pany Group Chairman of Johnson & Johnson, Ortho's parent company—to congratulate him on "his new position as Group President." Pls. SOF ¶ 194; SOF ¶ 373. De Chirico also wrote, "I am coming back to USA as President of Immucor, Inc. ... I am pleased to hear about your promotion that, I'm sure, will give us opportunities to see each other. Maybe we will have this opportunity at AABB in San Diego." Pls. SOF ¶ 195.

At the beginning of 2004, Clifford Holland, Burzik's replacement as Ortho's Worldwide President, convened a "Summit" meeting with other executives to discuss ways of improving Ortho's businesses. SOF ¶¶ 306, 293. In the wake of the Summit, Ortho considered another sizeable price increase on TBRs. SOF ¶ 307. Ortho hired Trinity, an outside consulting firm, in 2004 to develop pricing models, ranging from a 100% to 500% increase, and to assess the strategic risks and rewards of a TBR price increase. SOF ¶ 310, 316. In completing the analysis, Ortho and Trinity modeled a variety of Immucor reactions to an increase. SOF ¶ 312. Ortho ultimately settled on an average 125% price increase on its TBRs, effective January 1, 2005. SOF ¶¶ 317, 319. Ortho personnel scheduled a presentation to discuss the strategy and rationale for the increase with Davis and Ortho's Global Management Board. SOF ¶¶ 319.

Sometime after the presentation, Immucor's De Chirico and Ortho's Davis met at the American Association of Clinical Chemistry meeting in July 2004. Pls. SOF ¶ 197. Although Davis states he does not recall seeing De Chirico, he assumes that he must have "bumped into" him as he returned with De Chirico's business card. SOF ¶ 639. On July 30, 2004, De Chirico emailed Davis's administrative assistant: "[Davis] is a very nice person, and I was happy to talk to him since so long. I had a very good working relationship when I was

in Raritan; he has a good business sense." Pls. SOF ¶ 198. Shortly after this exchange, on August 31, De Chirico wrote to Poynter concerning a rumored Ortho price increase and told him to "[g]et me prices as soon as you get it. We will increase prices for [TBR] ... We will decide how much when we have Ortho prices." Pls. SOF ¶ 4. After receiving a copy of Ortho's price list, Poynter expressed reservations about joining in the increase as Ortho's price increase "[was] a huge gamble, because they are not being successful today, so why raise the price? The majority of accounts still use [TBRs]. [Ortho is] counting on us to follow and make their job easier!" Pls. SOF ¶ 6.

On September 13, 2004, Ortho sent out its revised 2005 price list, reflecting its 2005 price increase, to at least one customer. SOF ¶ 347. On September 29, 2004, an Immucor Regional Manager, Irene DeMezzo, emailed Poynter to express displeasure with Immucor's strategy in the wake of Ortho's price increase announcement:

[p]rice did make many of my customers switch ... about ½ Million dollars per year. I just think we could have gotten a huge share of the market if we left pricing where we were and then increased pricing .... by that time Ortho would have lost instruments sales and reagent sales. Price is a factor but why would we allow it to be easier for Ortho? ... I think we would do better to gain market share this year, acknowledging we will raise pricing in the future. I just hate that we are making things easier on them by playing into their hands.

Resp., Ex. 17, Email from M. Poynter to I. DeMezzo ("Poynter–DeMezzo Email"), Sept. 29, 2004. Poynter promptly responded with "[y]ou are singing to the choir here, but you know my orders, and being a

good soldier, I am trying to offer the best we can." *Id.*

During the week of October 2, 2004, Immucor began announcing its own pricing strategy for 2005 by meeting with GPOs. SOF ¶ 403. It announced the strategy to its sales force on October 24, 2004 during the annual AABB meeting. SOF ¶ 388. Its program included a "Customer Loyalty Program," with a tiered pricing structure that created a price difference between Ortho prices and prices for Immucor's committed tiers. SOF ¶¶ 390–91. Immucor increased Base tier prices by 95%, Level I tier prices (for those committed to buying 70% or more of their TBRS from Immucor) by 70%, and Level II tier prices (for those committed to buying 90% or more of their TBRs from Immucor) by 58%. SOF ¶¶ 390–92, 394. Poynter confirmed the TBR price increase in an internal email on October 27, 2004, stating that "[Immucor] based this [price list] on Ortho pricing levels … [s]o some [prices] have jumped due to [Ortho's] jmp (sic)!" Pls. SOF ¶ 8.

In response to a customer's request for reduced TBR pricing, Poynter wrote, "[t]here is no decrease in the reagent market; [Ortho] has raised prices by over 110% effective January 2005. We had to make adjustments in our pricing." Pls. SOF ¶ 9. On November 26, 2004, Immucor announced by letter its new pricing to non-group members who were subject to the increase. SOF ¶ 399. Immucor cited increased raw material costs, regulatory mandates, and recent investments in automation as the basis for the increase. SOF ¶ 400.

Some Immucor executives were dissatisfied with the results of the price increases as there were "[s]ome successes, but [the] majority of customers remain status quo despite Pricing Differential." SOF ¶ 459. While Immucor had hoped to capture an additional 20% to 50% of TBR market share, it reportedly fell short of that goal. SOF ¶ 460.

During this period, Immucor employees engaged in an email exchange concerning the market for its proprietary reagent machines. In the email, an employee of one of Immucor's customers, stated "[i]t doesn't look like Immucor is making it easy to do business with them. Suggest we turn our attention to Ortho Diagnostics" and included an Immucor employee in the recipient list. Resp., Ex. 165, Email from Beck to Covington ("Beck–Covington Email"), Dec. 15, 2004. The Immucor recipient forwarded it to a second Immucor employee. The second employee responded to the first, stating, "[g]ood job Danny! Let them talk to Ortho. They will find that Ortho will not give them anything …." *Id.*

In another internal email on December 15, 2004, Poynter wrote that while "there are a lot of pissed off customers, [ ] we have no choice! You know the 'story.' " Pls. SOF ¶ 253. He also informed Immucor sales staff that they "already [had] the 'story' surrounding [Immucor's] price increase." *Id.* Of the 2005 price increases, Poynter later stated that "I would have preferred to compete more on price in order to try to gain market share from Ortho; however, Nino De Chirico resisted such sale efforts." Pls. SOF ¶ 11.

Immucor increased its TBR price increases again in 2006 but retained the same tiered pricing structure that it had implemented in 2005. SOF ¶¶ 467–68. In 2006, Immucor increased its Base prices by 10% for most products, except products that were exclusive to Immucor. SOF ¶ 469. The prices of such exclusive products were raised by 40%. SOF ¶ 469. Immucor increased its Level I prices by 20%, and its Level II prices by 22–24%. SOF ¶ 469.

### 2. 2004 GPO Contract Cancellations

While Ortho and Immucor developed and implemented their price increases, they also cancelled a number of contracts with Group Purchasing Organizations ("GPOs") in short succession. In February 2004, Ortho signed a contract with Premier, a GPO, for purchase of TBRs that was effective February 15, 2004 through September 30, 2006, and provided for small price increases each year. SOF ¶¶ 348–49. Premier was Ortho's largest source of TBR revenue, and represented 26% of Ortho's TBR business. Pls. SOF ¶ 204. Despite the contract, Ortho presented Premier with the 2005 price increase numbers in the fall of 2004. SOF ¶ 353. Premier's Laboratory Committee reviewed Ortho's proposal to increase TBR prices ranging from 45.6% to 175.6%, effective January 1, 2005, and voted unanimously to reject it. SOF ¶¶ 353–54. Accordingly, on September 22, 2004, Ortho notified Premier that its contract for TBRs would be terminated December 31, 2004. SOF ¶ 355.

Immucor began announcing its 2005 price increases by meeting with GPOs during the week of October 4, 2004. SOF ¶ 403. Immucor's contract with Novation, a GPO, went into effect on October 1, 2004. SOF ¶ 404. Sometime between October 1 and October 8, 2004, Immucor proposed its 2005 price increases to Novation, despite their existing contract. SOF ¶ 405. Novation declined to accept the price increase, and Immucor informed Novation on October 12, 2004, that it would be cancelling the contract, effective January 10, 2005. SOF ¶¶ 406–07. A day later on October 13, Poynter emailed De Chirico stating that "[o]ne of [his] buddies called and said Novation is going to try to get Ortho on the Novation agreement." Pls. SOF ¶ 228. De Chirico responded two minutes later: "I do not think Ortho will do it, even if they do it the price will be the same." Pls. SOF ¶ 228.

Immucor also had a contract with Premier, the same GPO that was involved in Ortho's contract cancellation. By October 20, Immucor presented its 2005 price increase information to Premier for consideration, despite a pre-existing contract that substantially limited price increases. SOF ¶¶ 416–17. On October 20, 2004, Premier's Laboratory Committee unanimously voted to reject the 2005 Immucor price increases. SOF ¶ 417. In the wake of that rejection, Immucor notified Premier that it was cancelling its contract on November 1, 2004. SOF ¶ 418.

Novation and Premier, collectively represented approximately 27% of Immucor's revenue. Resp. to Pls. SOF ¶ 211. In mid-November 2004, Immucor issued its first press release announcing the contract cancellations. SOF ¶ 421. De Chirico requested that the following line be removed from the press release: "[the contract cancellation] was necessary to allow Immucor to raise prices in response to increases in the United States by its major competitor." Pls. SOF ¶ 225. Immucor issued another press release on December 9, 2004, stating that it was cancelling its contracts with Novation and Premier "for the purpose of increasing prices to the members of each group which will occur simultaneously with the cancellation." SOF ¶ 421; Pls. SOF ¶ 212.

### E. 2008 Price Increase

In 2007, Ortho and Immucor each began planning a 2008 price increase.[2] On April 5,

---

**2.** In 2008, Alba Bioscience ("Alba") entered the U.S. TBR market. SOF ¶¶ 565–66. Immucor viewed Alba as a low-cost provider "selling strictly on price." SOF ¶ 567. In August 2008, another firm, Biotest, announced that it received FDA approval to market a full line of TBRs. SOF ¶ 570. However, the two firms did not gain sizeable market share prior to the implementation of the 2008 price increase.

2007, Kingsbury, a "Co–Leader" of Ortho's implementation team for OCV, forwarded an email to several Ortho employees, attaching a news article on the growth of Immucor's stock since 2001 and commented, "[a]mazing what we started years ago would make [Immucor] which was near bankruptcy, come so far." Pls. SOF ¶ 232. Immucor employees were not reluctant to link the company's price increases on TBRs to Ortho's price increases—as one Immucor sales representative wrote to a customer, "[o]ur pricing and Ortho's pricing has increased due to raw material cost going up, our new manufacturing facility, and hiring of more employees." Pls. SOF ¶ 264.

In July 2007, Ortho began planning for the increase in earnest, creating a predictive model to evaluate a variety of TBR price scenarios. SOF ¶ 504. Ortho evaluated price increases ranging from 15% to 75%, and concluded that increasing 0.8% red blood cells TBRs by 25% and all other TBRs by 75% was the best option. SOF ¶ 504.

Immucor executives monitored Ortho's movements carefully and offered a $500 bounty for Ortho's 2008 TBR price list in October 2007. SOF ¶¶ 560. In an internal September 18, 2007, email, Kevin Crittenton, an Immucor Regional Sales Manager, expressed reservations about potentially antagonizing Ortho: "If we are into (sic) careful we can get into a price war with Ortho." Pls. SOF ¶ 234. Ortho was not immune to similar concerns about riling Immucor. An internal Ortho memorandum, which references financial results from 2005, stated "[t]here are no real winner[s] in war—especially a price war." Pls. SOF ¶ 235.

Ortho's Worldwide Pricing Committee approved the 2008 price increase on December 7, 2007. SOF ¶ 515. The price increase was slated to go into effect in March 2008. SOF ¶ 511. By this time, certain Ortho employees were questioning the use of Ortho's rising costs explanation for repeated price increases. Jeremy Stackawitz, Ortho's then Director of Worldwide Marketing for Immunohematology (which included TBRs), wrote "more importantly, I'm becoming increasingly uncomfortable leaning heavily on the (sic) Our costs are all going up disproportionately to our price increase," because "in general, it's not [true]. And it's not why we're taking price anyway." Pls. SOF ¶ 256. Stackawitz continued, "I don't think the cost going up piece feels very true or relevant right now." Id.

On January 11, 2008, Immucor raised its previous bounty for Ortho's 2008 TBR price list to $1,000. SOF ¶ 563. Immucor adopted the strategy "You Have Options," and briefly delayed its 2008 price increase. SOF ¶ 583. Immucor's strategy to delay its 2008 price increase resulted in limited conversions of Ortho accounts to Immucor accounts. SOF ¶ 591. At least one customer that purchased all of its TBRs from Ortho switched to Immucor after Ortho's 2008 price increase became effective. SOF ¶ 591.

During this period, in January 2008, De Chirico was informed that Ortho allegedly told a customer Immucor would be following Ortho's price increase because "Immucor always follows us." Pls. SOF ¶ 18. De Chirico replied, "This is good." Pls. SOF ¶ 18. Subsequently, in a January 30, 2008 internal email, De Chirico wrote that "[he was] asking Marketing to prepare by day end a List Price that mirrors Ortho's." Pls. SOF ¶ 17. On March 24, 2008, the same month that Ortho's price increase went into effect, Immucor announced its own TBR price increase, effective July 1, 2008. SOF ¶ 594.

Immucor's 2008 price tiers for nongroup purchasing organization customers were categorized as Automation, Base,

Market, and List. SOF ¶ 599. Immucor decided to increase its Base prices by 50% for TBRs and its Automation prices by 20% in 2008, while Immucor's List and Market tiers were on par with Ortho's List and Market/Discounted prices. SOF ¶ 606. To qualify for the discounted Base tier, customers were required to purchase most of their blood reagents from Immucor. SOF ¶ 603. To qualify for the discounted Automation tier, customers were required to purchase most of their blood reagents, including both TBRs and ABRs, from Immucor and use an Immucor instrument, which was required for ABR use. SOF ¶¶ 604–05. A 2008 Immucor Market Trends report stated that "[f]or the past 8 years, a duopoly has existed in the [TBR] marketplace, and this "[l]imited competition ... has allowed pricing to be raised with little ramifications from the marketplace." Pls. SOF ¶ 41.

### F. Evidentiary Issues

The Court will next address two evidentiary issues relating to consideration of parties' statements and statements of co-conspirators at the summary judgment stage. "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial. In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016).

#### 1. Parties' Statements

The Court has limited its review of the evidence of statements of officers/employees of Ortho and Immucor to those made by a "party's agent or employee on a matter within the scope of that relationship and while it existed" as provided by Federal Rule of Evidence 801(d)(2) covering party admissions. All of the quoted employees were involved in the sale and distribution of products sold by Ortho and Immucor during the relevant time period. Thus, their statements are not hearsay and are considered at the summary judgment stage as party admissions against the speaker's employers.

#### 2. Co–Conspirator Statements

The Court considers statements made by Ortho's co-conspirator, Immucor, through its employees "during and in furtherance of the [price-fixing] conspiracy" pursuant to Federal Rule of Evidence 801(d)(2)(E) covering statements of co-conspirators. For a statement to fall within the co-conspirator exception to the hearsay rule, "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). The Court considers for purposes of the pending Motion those co-conspirator statements that fall within the ambit of Federal Rule of Evidence 801(d)(2)(E) and will determine whether those statements, combined with plaintiffs' other evidence, are sufficient to defeat the Motion for Summary Judgment.

### III. PROCEDURAL HISTORY

Plaintiffs began to file civil lawsuits against Ortho and Immucor in 2009, shortly after the Antitrust Division of the Department of Justice opened a criminal grand jury investigation into blood reagents pricing. By Orders dated August 17, 2009, and August 19, 2009, the Judicial Panel on Multidistrict Litigation transferred twenty-three of those cases to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Another ten cases were originally filed in this Court. By Order dated December 23, 2009, this

Court consolidated these thirty-three cases pursuant to Federal Rule of Civil Procedure 42(a).

Plaintiffs filed a Consolidated Amended Class Action Complaint on February 15, 2010. On August 23, 2010, the Court denied Ortho's and Immucor's Motions to Dismiss the Consolidated Amended Class Action Complaint. *See In re Blood Reagents Antitrust Litig.*, 756 F.Supp.2d 623 (E.D. Pa. 2010).[3] The Court denied their Motion for Reconsideration of that ruling on December 14, 2010. *See id.* at 637.

Plaintiffs filed their Motion for Class Certification on September 16, 2011. By Order dated September 6, 2012, the Court granted plaintiffs' Motion for Final Approval of the Settlement with Immucor, leaving Ortho as the sole defendant. The Court held a hearing on Plaintiffs' Motion for Class Certification on July 26, 2012. By Memorandum and Order dated August 22, 2012, the Court granted plaintiffs' Motion for Class Certification. After conducting a "rigorous analysis of the evidence offered by both parties," *In re Blood Reagents Antitrust Litig.*, 283 F.R.D. 222, 240 (E.D. Pa. 2012), *vacated and remanded*, 783 F.3d 183 (3d Cir. 2015), the Court rejected defendant's reliability challenges to Dr. Beyer's damages methodologies. Ortho petitioned the United States Court of Appeals for the Third Circuit for leave to appeal pursuant to Federal Rule of Civil Procedure 23(f), and that petition was granted on October 25, 2012.

This Court's initial decision certifying the class was based, in part, on the Third Circuit's then—controlling decision in *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011), which was later reversed by the Supreme Court on March 27, 2013, *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). Based

on the reversal of its decision in *Behrend* by the Supreme Court, on April 8, 2015, the Third Circuit vacated and remanded this Court's August 22, 2012, Order granting plaintiffs' Motion for Class Certification and directed the Court to "decide in the first instance which of [defendant's] reliability attacks, if any, challenge those aspects of plaintiffs' expert testimony offered to satisfy Rule 23 and then, if necessary, to conduct a *Daubert* inquiry before assessing whether the requirements of Rule 23 have been met." *In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 188 (3d Cir. 2015). On June 26, 2015, the parties filed post-remand opening briefs.

After a lengthy and thorough inquiry of the testimony of plaintiff's expert, Dr. Beyer, the Court rejected Ortho's *Daubert* challenges to his testimony at the class certification stage. The class, consisting of "all individuals and entities who purchased [TBRs] in the United States directly from Immucor and Ortho at any time from November 4, 2000 through the present excluding defendants, and their respective parents, subsidiaries and affiliates, as well as any government entities," was recertified on October 19, 2015. Pursuant to Case Management Order No. 4 dated January 26, 2016, Ortho filed its Motion to Exclude the Expert Testimony and Reports of John C. Beyer, Ph. D., and its Motion for Summary Judgment. The Court held a hearing on the Motion to Exclude and Motion for Summary Judgment on January 20, 2017. By Memorandum and Order dated July 19, 2017, the Court denied Ortho's Motion to Exclude the Expert Testimony and Reports of John C. Beyer, Ph. D. The Court now considers Ortho's pending Motion for Summary Judgment.

---

**3.** The Court dismissed plaintiffs' claims against Ortho's parent company, Johnson &

Johnson Health Care Systems. *See Blood Reagents*, 756 F.Supp.2d at 633.

## IV. APPLICABLE LAW

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. This provision was "intended to prohibit only unreasonable restraints of trade." *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). "Certain categories of agreements, however, have been held to be *per se* illegal, dispensing with the need for case-by-case evaluation." *Id.* Due to its "actual or potential threat to the central nervous system of the economy," *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n.59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), horizontal price fixing is deemed *per se* unreasonable, *In re Chocolate Confectionary Antitrust Litigation*, 801 F.3d 383, 395 (3d Cir. 2015). To succeed on their claim, plaintiffs "need only prove that the defendants conspired among each other and this conspiracy was the proximate cause of the plaintiff's injury." *Id.* at 395 (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003).

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Evidence of parallel behavior or even conscious parallelism, alone, is insufficient to establish a violation of Section 1. *Id.* at 553–54, 127 S.Ct. 1955. Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). "The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554, 127 S.Ct. 1955.

The Supreme Court has "hedged against false inferences from identical behavior at a number of points in the trial sequence." *Id.* "[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently ...." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51–52 (3d Cir. 2007) ("*Twombly* ... signaled the vitality of *Matsushita* and *Monsanto*.")). The Court first explains the *Matsushita* summary judgment standard, and then discusses its application.

### A. The Matsushita Standard

"Generally, the movant's burden on a summary judgment motion in an antitrust case 'is no different than in any other case.'" *InterVest*, 340 F.3d at 159–60. Thus, summary judgment is appropriate when the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether ... there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. Existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* at 252, 106 S.Ct. 2505. In considering a motion for summary judgment, "the [C]ourt is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

As the Supreme Court explained in *Matsushita*, however, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." 475 U.S. at 588, 106 S.Ct. 1348 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (holding "that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy")). "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto*, 465 U.S. at 764, 104 S.Ct. 1464). "[I]n other words, [plaintiffs] must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed [plaintiffs]." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). "More evidence is required the less plausible the charge of collusive conduct." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002).

The Third Circuit held that "the *Matsushita* standard applies only when the plaintiff has failed to put forth direct evidence of conspiracy." *InterVest*, 340 F.3d at 160 (citations omitted). "This is because direct evidence obviates the fact finder's need to make inferences of a conspiracy, and therefore the Supreme Court's concerns over the reasonableness of inferences in antitrust cases evaporate." *Id.* (citations omitted). Direct evidence is, for example, "an explicit admission from a participant that an antitrust conspiracy existed." *Chocolate*, 801 F.3d at 396. In this case, plaintiffs have not presented direct evidence of conspiracy as to any of the price increases. Thus, *Matsushita* applies.

In *Eastman Kodak Co. v. Image Technical Services., Inc.*, 504 U.S. 451, 468–69, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), the Supreme Court clarified that *Matsushita* "did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases." "*Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision." *Id.*; *see also Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1231–32 (3d Cir. 1993). "*Monsanto* and *Matsushita* do not mean that antitrust defendants are entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather, the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that [the defendants] were acting independently." *InterVest*, 340 F.3d at

160 (citation omitted). "In sum, a court 'must ascertain whether the plaintiffs have presented evidence that is sufficiently unambiguous' showing that the defendants conspired." *Id.* (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)).

### B. Analyzing Evidence at the Summary Judgment Stage

"There is often a fine line between legitimate business practices and unlawful concerted action, and direct evidence—the smoking gun—of illegal conspiracy may not be available. Thus it is essential to consider all of the evidence proffered to determine whether it is sufficient to withstand a motion for summary judgment." *Cosmetic Gallery*, 495 F.3d at 51–52. Importantly, "a court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead analyze it as a whole to see if together it supports an inference of concerted action." *InterVest*, 340 F.3d at 160.

Plaintiffs allege that Ortho and Immucor engaged in a horizontal price-fixing conspiracy. Thus, "although it falls short of conclusively establishing an agreement or itself constituting a Sherman Act offense, a showing of consciously parallel behavior may be admissible as circumstantial evidence." *Cosmetic Gallery*, 495 F.3d at 51–52. "To establish illegal concerted action based on consciously parallel behavior, a plaintiff must show (1) that the defendants' behavior was parallel; (2) that the defendants were conscious of each other's conduct and this awareness was an element in their decision-making process; and (3) certain plus factors." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 360 n.11 (3d Cir. 2004). "Existence of . . . plus factors tends to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Id.* Although "no exhaustive list exists[,]" the Third Circuit has

identified "at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price-fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy." *Id.* Parallel price fixing "must be so unusual that in the absence of an advance agreement, no reasonable firm would have engaged in it." *Chocolate*, 801 F.3d at 400.

"In the context of parallel pricing, [motive and actions contrary to interests] largely restate the phenomenon of interdependence." *Flat Glass*, 385 F.3d at 360. "In a concentrated or oligopolistic market . . . a single firm's change in output or price will have a noticeable impact on the market and its rivals. Therefore, the theory of interdependence posits that any rational decision by an oligopolist must take into account the anticipated reaction of the other firms." *Chocolate*, 801 F.3d at 397 (internal quotation marks and brackets omitted). Accordingly, motive and actions contrary to interest "may not suffice—by themselves—to defeat summary judgment on a claim of horizontal price-fixing among oligopolists." *Id.* at 361.

## V. DISCUSSION

Plaintiffs allege that Ortho and Immucor conspired to raise prices on TBRs three times during the class period—in 2001, 2005, and 2008. In its Motion for Summary Judgment, Ortho argues that (1) plaintiffs have not established a basis to apply a *per se* antitrust standard, (2) prices were not raised in parallel in 2005 and 2008, (3) plaintiffs have not presented sufficient traditional conspiracy evidence to survive summary judgment, and (4) the statute of limitations bars plaintiffs' claim for antitrust damages for purchases made prior to May 18, 2005.

## A. Per Se Standard—Rule of Reason Standard

■ Ortho contends that plaintiffs' claim should be subject to the Rule of Reason standard, not the *per se* standard, because plaintiffs have "[i]n substantial part ... abandoned their initial price-fixing theory." Mot. for Summ. J. 11. To succeed under a rule of reason standard, a plaintiff must show that:

(1) the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464–65 (3d Cir. 1998). The plaintiff must also show in a rule of reason case that "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 315 (3d Cir. 2010). By contrast, to succeed under the *per se* standard, "prongs two and three are conclusively presumed satisfied" and plaintiffs need "only show the existence of a genuine issue of material fact regarding concerted action and proximate causation." *Rossi*, 156 F.3d at 465.

■ Generally, horizontal price fixing is considered a *per se* violation of the Sherman Act. *Chocolate*, 801 F.3d at 395. "However, when the evidence consists of mere exchanges of information the presumption [of a *per se* standard] vanishes." *Baby Food*, 166 F.3d at 118. In cases involving only exchanges of information, courts evaluate the information exchanges under a rule of reason analysis to determine whether the challenged conduct had anti-competitive effects. *Id.* at 121. Plaintiffs offered no evidence or argument for

the Court to use in performing a rule of reason analysis.

■ Ortho argues that plaintiffs have abandoned their price-fixing conspiracy theory because they no longer allege an agreement between Ortho and Immucor concerning specific prices to charge or a specific percentage or amount to raise prices. Plaintiffs disagree and state they continue to allege an ongoing and lengthy conspiracy between the two firms, resulting in substantial price increases throughout the class period. Resp. 3.

The Court concludes that plaintiffs have not abandoned their conspiracy allegations as Ortho contends. The Court will thus apply a *per se* standard in this case because plaintiffs allege an ongoing conspiracy and are required to present evidence that tends to exclude the possibility that the price increases were the product of interdependent conduct in order to survive summary judgment.

The Court must next determine whether Ortho and Immucor engaged in parallel conduct when they instituted the 2001, 2005, and 2008 price increases.

## B. Parallel Conduct—2005 and 2008 Price Increases

■ Ortho does not contend that the 2001 price increase by Ortho and Immucor was not parallel. However, it does argue that plaintiffs have not proffered evidence of parallel pricing as to the 2005 and 2008 price increases. Mot. for Summ. J. 37. The Court disagrees and concludes that plaintiffs' evidence raises a genuine dispute of material fact as to whether the 2005 and 2008 price increases constitute parallel conduct.

In early to mid 2004, Ortho began considering a 2005 price increase and ultimately settled on an approximately 125% price increase, effective January 1, 2005. SOF ¶¶ 306–07, 317–19. On September 13,

2004, Ortho sent its price list to at least one customer. SOF ¶ 347. Immucor quickly began announcing its own price increase for 2005, during the week of October 2, 2004. SOF ¶ 403. It settled on a tiered pricing structure, which increased Base prices by 95%, Level I prices (for those committed to purchasing 70% of their TBRs from Immucor) by 70%, and Level II prices (for those committed to purchasing 90% of their TBRs from Immucor) by 58%. SOF ¶¶ 390–92, 394. An Immucor employee, Mike Poynter, stated that "[Immucor] based this [price list] on Ortho pricing levels ...." Pls. SOF ¶ 8. Immucor's increased prices went into effect for some customers on January 1, 2005—the same day as Ortho's effective date for its price increases. SOF ¶ 401. Immucor raised TBR prices a second time in 2006 but retained the 2005 tiered structure. SOF ¶¶ 467–68. As part of that 2006 price increase, Immucor's Base tier prices increased by 10% for most products other than products unique to Immucor, which increased by 40%. SOF ¶ 469. Immucor also increased its Level I prices by 20%, and its Level II prices by 22–24% at that time. SOF ¶ 469.

Ortho again led the way on December 7, 2007, approving an approximate 75% price increase, effective March 2008. SOF ¶ 515. In a January 30, 2008 email, Immucor President De Chirico stated that "[he was] asking Marketing to prepare by day end a List Price that mirrors Ortho's." Pls. SOF ¶ 17. On March 24, 2008, the same month that Ortho's price increase became effective, Immucor announced its own price increase, effective July 1, 2008. SOF ¶ 594. Immucor's 2008 TBR price tiers for non-group purchasing organization customers were categorized as Automation, Base, Market, and List. SOF ¶ 599. During that 2008 price increase, Automation tier prices were raised by 20%, and Base tier prices were raised by 50%. SOF ¶ 606. Immucor's List and Market tiers were increased to be on par with Ortho's List and Market/Discounted prices in 2008. SOF ¶ 606.

To show parallel price increases by Ortho and Immucor in 2005 and 2008, plaintiffs rely heavily on Dr. Beyer's analysis. Ortho has countered with analysis by one of its experts, Dr. Lawrence Wu, arguing that Dr. Wu's analysis demonstrates that the pricing differential between Ortho's and Immucor's prices grew from 2005 to the end of the class period, indicating that the 2005 and 2008 price increases were not parallel.

Dr. Wu contends that the relevant inquiry for parallel pricing is the change in price differential between Ortho and Immucor for TBRs throughout the class period compared to the pre-alleged conspiracy period. Mot. for Summ. J., Ex. 51, Expert Report of Dr. Lawrence Wu ("Wu Rep."), ¶ 59. Dr. Wu concludes that the percentage price differential fluctuated from a low of 12% to a high of over 60% during the class period, compared to the pre-conspiracy pricing differential of 19%. *Id.* According to Dr. Wu, this fluctuation and eventual increase in the pricing differential between Ortho's and Immucor's prices supports his opinion that Ortho and Immucor did not raise prices in parallel. *Id.* ¶ 81.

As to the 2005 price increase, Dr. Beyer argues that Ortho and Immucor both announced substantial price increases. Resp., Ex. 2, Reply Report of John C. Beyer, Ph.D. Regarding Liability and Damages ("Reply Rep."), March 25, 2016, ¶ 103. In Dr. Beyer's opinion, the introduction of pricing tiers by Immucor is not inconsistent with allegations of conspiracy. *Id.* Dr. Beyer also states that the subsequent increase by Immucor in 2006 brought prices even closer to Ortho's 2005 prices, accounting for Dr. Wu's finding that there were no statistically significant differences in prices between the two companies' pricing in 2006 and 2007. *Id.*

As for the 2008 price increase, Dr. Beyer contends that the relevant comparison is between Ortho's prices and Immucor's Market or List tier prices and that Dr. Wu ignores this argument. Beyer Reply ¶¶ 104–05. Following the 2008 increase, the prices for Ortho's TBRs and Immucor's TBRs at the Market or List tier prices were equivalent. SOF ¶ 606. Dr. Beyer supports his argument by referencing the requirements for Immucor customers to receive the discounted Automation and Base tier pricing. *Id.* ¶ 104. For Immucor customers to be on the Base tier, customers were required to purchase most of their reagents from Immucor. SOF ¶ 603. To qualify for the Automation tier, they had to meet the Base tier requirements, of purchasing most of their TBRs and ABRs from Immucor, and have an Immucor instrument, which was necessary to use ABRs. SOF ¶¶ 604–05.

■ Dr. Wu's statistical analysis is not dispositive of this issue. "[P]arallel pricing does not require 'uniform prices,' and permits prices within an agreed upon range . . . ." *Baby Food*, 166 F.3d at 132 (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 222, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) ("Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible.")). "[I]llegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement." *LaFlamme v. Societe Air France*, 702 F.Supp.2d 136, 151 (E.D.N.Y. 2010) (citing *City of Moundridge v. Exxon Mobil Corp.*, No. 04-CV-940 (RWR), 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms.")).

Immucor's implementation of tiered pricing in 2005, with discounted prices for those who committed to purchasing the bulk of their reagents from Immucor, does not automatically render the 2005 price increase non-parallel behavior. Customers that did not commit to buying at least 70% of their TBRs from Immucor received a 95% price increase, with another 10% increase following in 2006. While not identical to Ortho's 125% price increase, a 95% price increase was sizeable and would arguably curtail the number of Ortho customers who would switch to Immucor's products. For example, an Ortho December 2008 presentation stated that a price decrease of 20–30% was the customer threshold to consider switching vendors, at least as to switching to Biotest. Pls. SOF ¶ 13. In a November 1999 presentation, Ortho noted that the cost of switching "would be enough to deter switching for shoppers for minor price changes." Pls. SOF ¶ 13. Immucor's significant increase on TBRs in 2005, followed by another increase in 2006, creates a genuine dispute of material fact concerning parallel behavior as to the 2005 price increase.

Similarly, Dr. Beyer's opinion that the relevant comparison is between Immucor's Market and List tier prices and Ortho's prices creates a genuine dispute of material fact as to the parallel nature of the 2008 price increase. Although Immucor kept a tiered price system for its 2008 increase, only customers purchasing most of their reagents from Immucor were eligible for discounted prices below Ortho's prices. The rest of Immucor's customers or potential customers were required to pay prices that were specifically increased to "mirror[ ] Ortho's." Pls. SOF ¶ 17. Likewise, the four-month gap between Ortho's and Immucor's price increase implementations does not disprove parallel behavior. Immucor announced its 2008 increase in March, the same month that Ortho implemented its increase. Thus, any potential customers that may have considered converting to Immucor in the wake of Ortho's price in-

crease were no longer incentivized to switch.

The Court concludes that plaintiffs' evidence raises a genuine dispute of material fact as to whether the 2005 and 2008 price increases constitute parallel conduct. The Court next considers each of the "plus factors"—motive to enter into a conspiracy, actions contrary to interest, and evidence implying a traditional conspiracy—in turn.

## C. Motive to Enter into Conspiracy

■ The first plus factor, motive to enter into a conspiracy, is demonstrated through evidence "that the industry is conducive to oligopolistic price fixing, either interdependently or through a more express form of collusion." *Flat Glass*, 385 F.3d at 360. The Court concludes that plaintiffs have presented sufficient evidence to establish that Ortho had a motive to engage in a price-fixing conspiracy from 2001 to 2008.

Markets with only two firms, like the TBR market, are highly concentrated and are conducive to collusion. *Id.* at 361. Likewise, in a highly concentrated market such as the TBR market, it is also easier for firms to monitor the actions of co-conspirators and maintain pricing discipline. *See High Fructose*, 295 F.3d at 656 ("[E]laborate communications, quick to be detected, would not have been necessary to enable pricing to be coordinated. And if one seller broke ranks, the others would quickly discover the fact, and so the seller would have gained little from cheating on his coconspirators; the threat of such discovery tends to shore up a cartel.").

High barriers to entry also make an industry more conducive to collusion. *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012). New entrants to the TBR industry faced a lengthy and taxing FDA licensing process. Poynter Decl. ¶ 26; Weiss Decl. ¶ 15. Executives from both companies believed that the firms operated

in a market that was difficult to enter. Gallup, then-Chief Executive Officer of Immucor, addressed the high barriers to entry in a 2002 interview with *The Wall Street Transcript.* SOF ¶¶ 117–19. When asked if "[Immucor's price increases in 2001] [would] lead to more competition," Gallup replied that "[i]t took the last company that applied six years to receive a FDA establishment license in this industry" and characterized FDA licensing as a "fairly large barrier to entry." SOF ¶ 119. Kingsbury, Director of Sales and Marketing for Ortho from 1996 through 1999, similarly recognized that the TBR market had high barriers to entry. SOF ¶ 130; Pls. SOF ¶ 51. These high barriers to entry primed the TBR market for collusion.

Declining prices or profits in a market make "price competition more than usually risky and collusion more than usually attractive." *High Fructose*, 295 F.3d at 657. Ortho argues in its Motion that, prior to the 2001 price increase, it was losing money and considering exiting the TBR market altogether. SOF ¶¶ 101, 106. Ortho's declining prices and uncertain future in the TBR market created an added incentive to enter into a price-fixing conspiracy. As Burzik, Ortho's President, told Poynter, Immucor's Vice President of Sales, in 2000, "Ortho's margins on [TBR] were terrible, and [ ] [Burzik] wanted to understand the margin situation regarding [TBR]." Pls. SOF ¶ 96. Ortho executives, specifically Burzik, believed the company was not making a sufficient profit on TBRs. Such a belief renders "collusion more than usually attractive." *High Fructose*, 295 F.3d at 657.

## D. Actions Contrary to Interest

■ The second plus factor, actions contrary to interest, is "conduct that would be irrational assuming that the defendant operated in a competitive market. In a competitive industry, for example, a firm

would cut its price with the hope of increasing its market share if its competitors were setting prices above marginal costs." *Flat Glass*, 385 F.3d at 360–61. The Court concludes that all of the price increases were actions contrary to Ortho's interest.

In its Motion, Ortho argues that the price increases were not actions contrary to its interest for three reasons. First, Ortho made a business judgment to adopt a larger increase under the BBLP after observing that Immucor responded to its OCV increase by also raising its prices. Mot. for Summ. J. 21; SOF ¶¶ 150–54, 156. Second, Ortho's primary concern was profitability, not retaining market share, and it could raise profitability even if it lost sizeable market share to Immucor. Mot. for Summ. J. 21–22; *see In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 877 (7th Cir. 2015). Third, Ortho was losing money by mid–1999 and was attempting to restore the profitability of its TBR business. Mot. for Summ. J. 21; SOF ¶¶ 101, 106, 45. Ortho also contends that Immucor's financial difficulties created an incentive for Immucor to raise prices at the same time as Ortho, and that Immucor risked Ortho rescinding its price increases if Immucor did not also raise prices. Mot. for Summ. J. 22.

Ortho's arguments concerning business judgment and lack of concern about retaining market share are unavailing at this stage of the case. As a preliminary matter, most, if not all, decisions by firms to raise prices qualify as business judgments—yet this Court is required to analyze them. At the time of its selection of the OCV plan, Ortho evaluated three scenarios, including the possibility that Immucor would immediately follow its planned 2000 price increase. SOF ¶ 136. The OCV team ultimately recommended that Ortho raise TBR prices by 50%, spread across two years in 25% increments. SOF ¶ 145. As part of the analysis, the OCV team also analyzed the extent of Ortho's potential lost sales volume depending on Immucor's response. SOF ¶ 138.

Despite this extensive preparation process, Ortho decided to abandon the strategy of a second 25% increase for a much larger increase of approximately 125%. Ortho attributes that decision to Immucor's participation in the 2000 increase and its alleged concern with profitability. However, Ortho's decision to suddenly adopt a larger increase, abandoning a previously set strategy and risking a sizeable market share loss in the process, constitutes an action against interest. Immucor's decisions to engage in substantial, repeated increases also appear to be against its self-interest. At key times when Immucor could potentially seize market share from Ortho, Immucor instead chose to mirror Ortho's price increases—despite frustration from Immucor employees like Poynter and its customers.

While Ortho's 2001 price increase may have been an attempt to restore profitability, Ortho and Immucor continued to raise TBR prices during the class period. Significantly, plaintiffs have presented evidence that Ortho's explanation to customers that these price increases were due to rising costs was inaccurate. *See infra* Section V.E. The Third Circuit addressed a similar issue in *Chocolate*, in which plaintiffs alleged that chocolate manufacturers in an oligopolistic market raised prices collusively. 801 F.3d at 399. In that case, there was substantial evidence in the record to support the defendants' contention that they raised prices in anticipation of rising costs, including the fact that costs did go up during the conspiracy period, and that the common practice of line pricing by retailers made it rational and self-interested for the defendants to follow price increases initiated by another manufacturer. *Id.* at 399–400. However, the Third Circuit held

that "[a]t this stage, the admissible testimony from the Plaintiffs' experts, coupled with other record evidence suggesting that price increases were not fully explained by cost increases, does the trick." *Id.* at 400.

In this case, plaintiffs' expert testified that cost and demand changes could not account for the 2001, 2005, or 2008 price increases. Beyer Aug. Rep. ¶¶ 32–35. Dr. Beyer compared Ortho's selling price with its standard costs for its top two products. *Id.* ¶ 34. He found that standard costs for those two products declined for much of the class period, and, thus, the price increases could not be explained by a corresponding rise in standard costs. *Id.* Dr. Beyer also compared the dollar change in price to the dollar change in standard cost for Ortho's top 20 reagents from 2005 to 2010 and determined that "changes in price dwarf[ed] changes in standard cost ... for all top reagents." *Id.*; *see also* Beyer Aug. Rep. Tables 7 & 8.

Dr. Beyer also concluded that changes in demand for TBRs did not explain the price increases. *Id.* ¶ 35. Demand for blood reagents is primarily dictated by the total amount of donated and transfused blood. *Id.* Over the class period, the amount of transfused and collected blood rose annually by two and three percent, respectively. *Id.* Weiss, an Immucor employee, also confirmed that demand for TBRs was "relatively stable." *Id.* Despite stable demand, Ortho and Immucor enacted sizeable price increases. Plaintiffs have produced sufficient evidence "that higher prices during the period of the alleged conspiracy cannot be fully explained by causes consistent with active competition ...." *High Fructose*, 295 F.3d at 660.

### E. Pretextual Explanations

Plaintiffs allegations of pretextual explanations by Ortho and Immucor for price increases, in particular the 2005 and 2008 increases, are insufficient to raise an inference of conspiracy. On November 26, 2004,

Immucor announced the 2005 price increase to non-group member customers who were subject to the increase, citing a rise in expenses due to raw material costs, regulatory mandates, and recent investments in automation, SOF ¶¶ 399–400, but did not mention Ortho's price increase. As with previous price increases, Ortho justified its 2008 price increase by referencing rising costs.

At least one Ortho employee found the series of price increases progressively harder to sell to customers. In October 2007, Jeremy Stackawitz, Ortho's Director of Worldwide Marketing for Immunohematology, which included TBRs, wrote: "[M]ore importantly, I'm becoming increasingly uncomfortable leaning heavily on the (*sic*) Our costs are all going up disproportionately to our price increase," because "in general, it's not [true]. And it's not why we're taking price anyway." Pls. SOF ¶ 256. Stackawitz continued, "I don't think the cost going up piece feels very true or relevant right now." *Id.*

Evidence of pretextual explanations for price increases or output restrictions, "if believed by a jury, would disprove the likelihood of independent action" by an alleged conspirator. *Fragale*, 760 F.2d at 474; *see also Rossi*, 156 F.3d at 478. Plaintiffs contend that Ortho's rising costs explanations for the price increases were merely cover for its real motivation to raise prices—to advance its price-fixing conspiracy with Immucor. Plaintiffs and Ortho dispute the extent to which rising costs account for Ortho's price increases, specifically the 2005 and 2008 increases. Ortho contends that its costs rose prior to the 2005 and 2008 price increases. Mot. for Summ. J. 31. However, viewing the evidence presented in the light most favorable to plaintiffs, the full extent of Ortho's price increases in 2005 and 2008 cannot be explained by rising costs. Nonetheless, the

Court recognizes that "allegations of pretext must be accompanied by other traditional conspiracy evidence or economic evidence to create a reasonable inference of a conspiracy." *Chocolate*, 801 F.3d at 412. "That rising costs may not have been the full or even real reason for increasing prices does not show whether the real reason was interdependence or a conspiracy." *Id.* at 411.

### F. Evidence Implying a Traditional Conspiracy

The Court next addresses the third plus factor, evidence of a traditional conspiracy presented by plaintiffs. The Court determines that plaintiffs have produced sufficient traditional conspiracy evidence to tend to exclude the possibility that the 2001 price increase was the product of interdependence as opposed to the product of a price-fixing conspiracy. However, considering plaintiffs' evidence in its entirety, the Court concludes that plaintiffs have not produced sufficient evidence to survive summary judgment as to the 2005 and 2008 price increases. That determination is based on the fact that, in an oligopolistic market, "[t]he most important evidence will generally be non-economic evidence that there was an actual, manifest agreement not to compete." *Id.* at 361. "That evidence may involve customary indications of traditional conspiracy, or proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown." *Id.*

Plaintiffs offer the strongest evidence of a conspiracy between Ortho and Immucor as to the 2001 price increase. Plaintiffs present three key pieces of evidence as proof of a conspiracy between Ortho and Immucor in advance of the 2001 price increase—Ortho's "radical and abrupt shift" from the smaller increase under OCV to a larger increase under BBLP, communications by senior Ortho employees with senior Immucor employees concerning pricing at the 2000 AABB annual meeting, and the providing of pricing information by Ortho to Immucor.

#### 1. 2001 Price Increase

█ Plaintiffs portray Ortho's shift from a second year of a 25% price increase to a larger increase of approximately 125% in 2001 as a radical shift in behavior that suggests collusion. Ortho responds that plaintiffs' argument concerning Ortho's change in pricing is incorrect because plaintiffs focus on Ortho's shift from one business plan to another instead of a broader change in industry practice. Additionally, Ortho contends that even if the shift is evaluated as traditional conspiracy evidence, it should be disregarded because plaintiffs narrowly focus on a single firm's price change in one year. The Court concludes that this shift in pricing strategy, standing alone, does not tend to exclude interdependent behavior but does suggest that shift may have been the product of collusion.

During the 1990s, TBR prices held relatively steady. Pls. SOF ¶ 29. In April 2000, Ortho implemented the first 25% price increase under OCV. SOF ¶¶ 147–48. Immucor followed in June 2000, with an approximate 20% increase in TBR prices. Poynter Decl. ¶ 4. In fall 2000, Ortho began considering a larger price increase than the 25% price increase called for under OCV. SOF ¶¶ 158, 162–63. Ortho adopted the larger increase as part of the BBLP and informed a select group of customers of the increase on November 21, 2000. SOF ¶¶ 185–86.

█ "For a change in conduct to create an inference of a conspiracy, the shift in behavior must be a "radical" or "abrupt" change from the industry's business practices." *Chocolate*, 801 F.3d at 410. In *Chocolate*, the plaintiffs claimed that the defen-

dants' decisions to follow price increases was a radical shift in behavior from previous conduct and relied on several previous "failed" price increases in the industry to support their argument. *Chocolate*, 801 F.3d at 409–10. The Third Circuit rejected this argument, observing that (1) plaintiffs referenced failed price increases on packaged candy when the price increases at issue in the case were on non-packaged candy; (2) in reality, parallel price increases in the U.S. chocolate market were not at all uncommon; and (3) it was "generally unremarkable for the pendulum in oligopolistic markets to swing from less to more interdependent and cooperative." *Id.* at 410.

While Ortho may be correct that the focus is on whether or not the actions by defendants are an abrupt change in business practices, *see Chocolate*, 801 F.3d at 410, Ortho's shift in business plan in 2000 is a central part in the alleged abrupt, industry-wide shift given the presence of only two firms in the market. Immucor also joined in the larger increase in 2001.

Plaintiffs allege that Ortho's adoption of the BBLP and its larger price increases, but not its adoption of the OCV plan, represents a radical shift in industry behavior. In addressing this argument the Court notes that the OCV itself was a departure from industry norms, as prices remained relatively steady prior to its implementation. Even so, the size of the price increase under BBLP distinguishes it from the OCV increase. During the planning phase for OCV, Ortho and the consulting firm it hired determined that if Ortho instituted a 100% price increase and Immucor did not, 69% of Ortho's customers would switch to another vendor. Pls. SOF ¶ 136. This possibility presented a sizeable risk, even after Immucor joined in the first 25% price increase.

The large size of the 2001 price increase constituted a radical shift from pricing trends over the previous decade, even considering the 2000 25% increase. As Ortho executive Richard Kastenschmidt recognized in planning for subsequent increases, "risk increases as the value of the price increase goes up for two reasons. One is the larger increase you take, the less likely your competition is to be comfortable with the same increase. On top of that, the larger increase that you make, the more appealing a price reduction and subsequently share play could be for your competition." Pls. SOF ¶ 165. However, the recent change in market concentration and a prior 25% increase following that industry consolidation mitigates the significance of this radical shift in industry pricing practice. Standing alone, the departure from previous pricing norms in the TBR industry does not tend to exclude the possibility that the shift was a product of interdependent conduct.

██ Although the sudden shift to large TBR price increases in the industry, without more, is not sufficient evidence of conspiracy, plaintiffs present compelling evidence of pricing-related discussions between Ortho and Immucor employees prior to the 2001 price increase. The Court agrees with plaintiffs that the nature of the communications, including a direct transfer of pricing information, and the communications' temporal proximity to the 2001 price increase raises an inference of conspiracy. While the "mere possession of competitive memoranda" is not evidence of concerted action to fix prices, *Baby Food*, 166 F.3d at 126, price information exchanges among companies' upper ranks that affect pricing decisions permit an inference of conspiracy, *Flat Glass*, 385 F.3d at 368–69.

The Third Circuit addressed the possession of pricing information in *Baby Food*. The plaintiffs in that case relied on defendants' possession of documents containing

their competitors' pricing information prior to public announcements of those increases. 166 F.3d at 118–19. Some of the pricing information was collected by low-level employees. *Id.* at 133–34. The Third Circuit held that this possession of competitive memoranda did not support plaintiffs' conspiracy claim, as "evidence of sporadic exchanges of shop talk among field sales representatives who lack pricing authority is insufficient to survive summary judgment." *Id.* at 125.

By contrast, in *Flat Glass*, plaintiffs presented evidence that the price exchanges occurred among higher-ranked employees, including one Vice President of the company. 385 F.3d at 364. The Third Circuit noted that "price discussion among low level sales people has little probative weight; we distinguish[ ] the far different situation where upper level executives have secret conversations about price." *Flat Glass*, 385 F.3d at 368–69. More importantly, "there must be evidence that the exchanges of information had an impact on pricing decisions." *Id.* at 369. In *Flat Glass*, "[s]everal of the key documents emphasize[d] that the relevant price increases were not economically justified or supportable, but required competitors to hold the line .... Predictions of price behavior were followed by actual price changes. The inference of concerted action rather than interdependent action [was] therefore stronger." *Id.*

In this case, as in *Flat Glass*, high-level executives including Ortho's and Immucor's Presidents expressed an interest in determining their competitor's pricing, had opportunities to conspire, and commissioned the transfer of pricing information. For example, during the 2000 AABB meeting, Burzik, Ortho's President, approached Mike Poynter, Immucor Vice President of Sales, asked if he had heard Ortho's presentation, and invited him to Ortho's booth. Pls. SOF ¶ 95. Burzik told Poynter that

"she had recently joined Ortho, that Ortho's margins on [TBR] were terrible, and that she wanted to understand the margin situation regarding [TBR]." Pls. SOF ¶ 96. She left her business card with Poynter and requested that he give it to Gallup "because she wanted to speak to him." Pls. SOF ¶ 97. Poynter subsequently delivered the business card to Galllup and "conveyed her request to speak with him." Pls. SOF ¶ 98. At the same 2000 AABB meeting, Gendusa was asked to introduce a high-ranking Ortho executive to Gallup at the Immucor booth, and he did so. Pls. SOF ¶¶ 103, 100.

The transfer of price information occurred or was ordered at the behest of higher level executives within Ortho and Immucor, unlike gathering and possession of pricing information by lower level employees in *Baby Food*. The direct documented transfer of pricing information occurred between Gendusa, then an Ortho Regional Vice President, and Thorne, then the Immucor Director of Marketing. Pls. SOF ¶116. Thorne contacted Gendusa at the behest of Gallup, Immucor's President, and gave Gallup the pricing information she had received from Gendusa. Thorne Empl. Dep. 206:8–12; Pls. SOF ¶ 117. Gallup's efforts to conceal the lunch, by ordering Thorne to expense it as if she had lunch with him and not Gendusa, further raises an inference of conspiracy Pls. SOF ¶ 118.

Additionally, the lunch attended by Gendusa and Thorne, during which Gendusa admittedly revealed Ortho pricing information to Thorne, immediately preceded Ortho's announcement of its price increase under BBLP. In fact, Ortho's 2001 finalized price increase was sent to a select number of recipients, including 138 of its distributors, 180 of its federal government accounts, and nine of its "pilot" customers on November 21, the same day as the

lunch. SOF ¶¶ 185–86. A day later, Ortho emailed its price increase letter and finalized price list to other customers. Pls. SOF ¶ 122. Although Ortho argues that any transfer of pricing information had no effect on its pricing decisions, Ortho did not present any evidence that it provided customers with information about the extent of the BBLP price increases prior to this mailing.

Immucor drastically shifted its pricing strategy after the 2000 AABB meeting, calling for a "significant" price increase of "much higher" than the previously targeted 20%. Poynter Decl. ¶ 13. On December 1, 2000, an Immucor salesperson received a copy of Ortho's 2001 TBR price list from a customer. SOF ¶ 247. Poynter, Weiss, and Gallup met on December 2, 2000, to review the price list. SOF ¶ 249. Three days later, Immucor announced its 2001 TBR price increases to customers. SOF ¶ 256. Approximately five months later, Gallup wrote to future Immucor President De Chirico that Immucor's "biggest wild card is Ortho must continue to hang tough on pricing. [Immucor has] no indication [Ortho is] caving in." Pls. SOF ¶ 186.

In this case, the explicit transfer of price information between relatively high-ranking employees of Ortho and Immucor, at the behest of Immucor's President, was followed shortly by significant price increases by both Ortho and Immucor. The nature of the pricing information transfer and the close temporal link between the transfer and announcement of the 2001 price increases raise an inference of conspiracy. *See In re Domestic Drywall Antitrust Litig.*, 163 F.Supp.3d 175, 197 (E.D. Pa. 2016) ("Opportunities to conspire may be probative of a conspiracy when meetings of Defendants are closely followed in time by suspicious actions or records.").

While the Court concludes that plaintiffs' evidence raises an inference of conspiracy as to the 2001 price increase, the evidence does not raise an inference of an ongoing, price-fixing conspiracy from which Ortho was required to withdraw as plaintiffs contend. The Court next considers in turn whether plaintiffs produced evidence that tends to exclude the possibility that the 2005 and 2008 price increases were the product of interdependence.

### 2. 2005 Price Increase

■■■ Ortho contends that, even if this Court concludes that the events surrounding the 2001 price increase tend to exclude the possibility that the 2001 price increase was a product of interdependence, plaintiffs have not presented sufficient evidence to survive summary judgment with respect to their claims based on the 2005 and 2008 price increases. In response, plaintiffs argue that this Court should avoid improperly compartmentalizing evidence and consider the 2005 and 2008 increases in light of the evidence presented as to the 2001 increase. After review of plaintiffs' evidence, without improperly compartmentalizing it, the Court concludes that plaintiffs have not offered sufficient evidence to tend to exclude the possibility that the 2005 and 2008 price increases were the product of interdependence. Plaintiffs' evidence as to the 2005 and 2008 price increases is consistent with lawful interdependent behavior in a market with only two suppliers.

The Court considers plaintiffs' traditional conspiracy evidence for the 2005 and 2008 price increases in the context of the 2001 price increase and other events because plaintiffs are not required to prove the elements of antitrust conspiracy for each segment of the alleged conspiracy. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Instead, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of

each." *Id.* at 699, 82 S.Ct. 1404. However, plaintiffs must still provide some credible evidence to support a finding that each increase was the product of a conspiracy, particularly when increases are separated by large amounts of time. *United States v. FMC Corp.*, 306 F.Supp. 1106, 1135 (E.D. Pa. 1969). "[T]he *Continental Ore* admonition against fragmentation of a conspiracy case does not preclude our analysis of the alleged unitary conspiracy." *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 513 F.Supp. 1100, 1168 (E.D. Pa. 1981).

As their traditional conspiracy evidence concerning the 2005 price increase, plaintiffs highlight the opportunities to conspire between Ortho and Immucor personnel prior to the 2005 price increase, internal Ortho and Immucor communications allegedly suggesting collusion between the companies, and the near simultaneous 2004 GPO contract cancellations by Ortho and Immucor.

After receiving a presentation on Ortho's potential 2005 price increase, Davis, Company Group Chairman of Ortho's parent company Johnson & Johnson, met De Chirico, Immucor's new President, at the American Association of Clinical Chemistry meeting in July 2004. Pls. SOF ¶ 197. On July 30, 2004, De Chirico emailed Davis's administrative assistant complimenting Davis: "[Davis] is a very nice person, and I was happy to talk to him since so long. I had a very good working relationship when I was in Raritan; *he has a good business sense.*" Pls. SOF ¶ 198 (emphasis added).

Proof of opportunity to conspire is relevant, but "is not enough to sustain an antitrust plaintiff's burden, and, without more, does not create a jury question on the issue of concerted action." *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir. 1985); *see also Petruzzi's*, 998 F.2d at 1235. The Third Circuit stressed in *Baby Food* that "[c]ompany personnel

do not often operate in a vacuum or 'plastic bubble'; they sometimes engage in the longstanding tradition of social discourse." 166 F.3d at 133 ("[E]vidence of social contacts and telephone calls among representative of the defendants was insufficient to exclude the possibility that the defendants acted independently."). As the Third Circuit stated in *Chocolate*, "[p]laintiffs' evidence is essentially that the executives . . . were in the same place at the same time, which is insufficient to support a reasonable inference of concerted activity." *Chocolate*, 801 F.3d at 409. To the extent plaintiffs' evidence only suggests that executives from each company were "in the same place at the same time," the Court will not draw an inference of concerted activity from those opportunities to communicate.

The Court also considers the internal communications that plaintiffs highlight. On August 31, 2004, De Chirico wrote to Poynter, Immucor Vice President of Sales, concerning the rumored Ortho price increase and told him to "[g]et me prices as soon as you get it. We will increase prices for [TBR] . . . We will decide how much when we have Ortho prices." Pls. SOF ¶ 4. After receiving Ortho's price list, Poynter observed that Ortho's price increase "[was] a huge gamble, because they are not being successful today, so why raise the price?" Pls. SOF ¶ 6. Ultimately, he concluded that Ortho raised prices because it was "counting on us to follow and make their job easier[.]" Pls. SOF ¶ 6. Ortho issued its revised 2005 price list, reflecting the price increase, to at least one customer on September 13, 2004. SOF ¶ 347.

Poynter was not the only Immucor employee to express consternation at Immucor's planned decision to join Ortho's price increase. DeMezzo, like Poynter, did not understand why Immucor was joining the price increase and emailed Poynter on

September 29, 2004, protesting Immucor's decision:

> Price did make many of my customers switch ... about ½ Million dollars per year. I just think we could have gotten a huge share of the market if we left pricing where we were and then increased pricing .... by that time Ortho would have lost instrument sales and reagent sales. Price is a factor but why would we allow it to be easier for Ortho? [...] I think we would do better to gain market share this year, acknowledging we will raise pricing in the future. I just hate that we are making things easier on them by playing into their hands.

Poynter–DeMezzo Email. Poynter replied, "[y]ou are singing to the choir here, but you know my orders, and being a good soldier, I am trying to offer the best we can." Poynter–DeMezzo Email. Shortly thereafter, during the week of October 2, 2004, Immucor began announcing its pricing differentiation strategy for 2005, which included price increases based on customer "tier." SOF ¶¶ 403, 394. As Poynter stated in an internal Immucor email on October 27, 2004, "[Immucor] based this [price list] on Ortho pricing levels ...[s]o some [prices] have jumped due to [Ortho's] jmp (*sic*)!" Pls. SOF ¶ 8. On November 26, 2004, Immucor announced the price increase to non-group member customers who were subject to the increase, citing a rise in expenses due to raw material costs, regulatory mandates, and recent investments in automation, SOF ¶¶ 399–400.

Despite customer displeasure, Immucor maintained its decision to join Ortho's price increase. One customer requested reduced TBR pricing. Poynter wrote in response, "[t]here is no decrease in the reagent market; [Ortho] has raised prices by over 110% effective January 2005. We had to make adjustments in our pricing." Pls. SOF ¶ 9. Similarly, in an email exchange including an Immucor customer and Immucor employees, the customer threatened to "turn [its] attention to Ortho" as "Immucor [isn't] making it easy to do business with them." Beck–Covington Email. In an internal exchange concerning that possibility, an Immucor employee congratulated another, stating "Good job Danny! Let them talk to Ortho. They will find Ortho will not give them anything ...." Beck–Covington Email. As Poynter wrote in an internal email on December 15, 2004, "there are a lot of pissed off customers, [ ] we have no choice! You know the 'story.'" Pls. SOF ¶ 253. Of the 2005 price increase, Poynter later stated that "many on my sales force and I would have preferred to compete more on price in order to try to gain market share from Ortho; however Nino De Chirico resisted such sale efforts." Pls. SOF ¶ 11.

Even taken in the light most favorable to plaintiffs, these internal communications do not suggest collusive behavior but simply reflect an awareness of a competitor's pricing and some dissatisfaction by customers and select Immucor employees with a business decision made by Immucor leadership. The Court concludes that those internal communications do not support an inference of conspiracy.

The Court next addresses plaintiffs' evidence concerning the near simultaneous cancellations of contracts with Group Purchasing Organizations (GPOs) by Ortho and Immucor. Those contract cancellations occurred in 2004.

On September 22, 2004, Ortho notified Premier, a GPO that was Ortho's largest source of TBR revenue at 26%, that the contract between Ortho and Premier for TBRs would terminate effective December 31, 2004. Pls. SOF ¶ 204; SOF ¶¶ 355. Ortho cancelled the contract to institute its 2005 price increase, despite signing it only six months earlier in February 2004. SOF ¶¶ 348–49.

Immucor soon joined Ortho, announcing its plan to raise prices in meetings with GPOs during the week of October 4, 2004, and ultimately cancelling contracts with two GPOs, Novation and Premier, that collectively represented approximately 27% of Immucor's revenue. SOF ¶ 403; Resp. to Pls. SOF ¶ 211. Like Ortho, Immucor sought to cancel GPO contracts that it recently signed. Immucor cancelled its contract with Novation on October 12, 2004. SOF ¶¶ 406–07. A day after Immucor cancelled the Novation contract, Poynter emailed De Chirico, "One of my buddies called and said Novation is going to try to get Ortho on the Novation agreement!" Pls. SOF ¶ 228. De Chirico replied, "I do not think Ortho will do it, even if they do it the price will be the same." Pls. SOF ¶ 228. Immucor cancelled its contract with Premier, the GPO with which Ortho had terminated its contractual relationship, on November 1, 2004. SOF ¶¶ 417–18.

Plaintiffs assert that the close proximity and riskiness of the 2004 GPO contract cancellations are evidence that Ortho and Immucor were engaged in an ongoing conspiracy. In support, they provide Dr. Beyer's evaluation of the cancellations. Dr. Beyer concluded that "[w]ithout cooperative behavior, canceling the GPO contracts would be an unusual and highly risky strategy." Beyer Aug. Rep. ¶ 78. In reaching his conclusion, Dr. Beyer considered the possibility that either company could have converted the other's GPO customers, the amount of revenue each company put at risk, and the perception of the cancellations both inside the company and the market at large. *Id.* ¶¶ 78–83. He ultimately determined that "[a]s an experienced economist, I find that the nearly simultaneous canceling of GPO contracts by Ortho and Immucor is most consistent with cooperative behavior based on the unlikelihood of both firms independently choosing this highly risky behavior." *Id.* ¶ 83.

Ortho and Immucor also faced some internal dissent on the issue of the GPO contract cancellations and customer resistance to their decisions. Gendusa, an Ortho Regional Vice President, stated Ortho's cancellation was "bad business." Pls. SOF ¶ 206. Ortho executive, Fran Kleinbard, testified that Ortho thought cancelling GPO contracts was "risky." Pls. SOF ¶ 207. Sandy Drake, an Immucor sales representative, wrote in an email, "[Immucor] didn't have any plans to give this [price] increase [Novation and Premier customers]," but did so because it was "kind of a werid (*sic*) situation Ortho put us in." Pls. SOF ¶ 224. Poynter stated "the decision to announce that Immucor had canceled the two GPO contracts in order to enact these significant price increases was unusual and was not made by the sales or marketing departments, because that explanation would have angered customers. Pls. SOF ¶226. In December, upon hearing that one of its customers was meeting with Ortho in response to the 2005 Immucor price increase, an Immucor employee stated, "[l]et them talk to Ortho. They will find that Ortho will not give them anything." Pls. SOF ¶ 229. At least one Immucor employee was relieved after receiving word that Ortho had refused to budge on its price increase for a loyal customer, writing "[n]ice to see Ortho holding the price" in regard to the 2005 price increase. Pls. SOF ¶ 231.

The 2004 GPO contract cancellations, even in the context of the previous 2001 price increase and plaintiffs' other evidence, do not create an inference of conspiracy. Immucor did not begin cancelling its GPO contracts until after Ortho had announced its cancellation. Even if the cancellations were "highly risky," Ortho and Immucor operated in a duopoly. Ortho announced its price increase on September 13, 2004 while Immucor announced a lesser but significant increase during the week

of October 2. Similarly, Immucor did not announce its GPO cancellations until after Ortho had announced both its price increase and its GPO cancellation. Plaintiffs' strongest evidence concerning the 2005 price increase is the testimony offered by Dr. Beyer that the 2004 GPO contract cancellation would have been risky in the absence of collusive conduct. But an instance of unusual and "risky" behavior, that could have been the result of one competitor in an oligopoly mimicking the actions of another competitor, does not tend to exclude the possibility that the 2005 price increase was the product of interdependence.

### 3. 2008 Price Increase

█ Plaintiffs' conspiracy evidence for the 2008 price increase is even more limited than that provided for the 2005 price increase. Plaintiffs highlight several intracorporate communications to support their assertion that the 2008 price increase was the product of an ongoing conspiracy. The Court concludes that, without improperly compartmentalizing plaintiffs' evidence, plaintiffs have not provided sufficient evidence to tend to exclude the possibility that the 2008 price increase was a product of interdependent conduct as opposed to an ongoing conspiracy.

At the end of January 2007, an Immucor sales representative explicitly linked Immucor's price increases to Ortho's to a customer, stating, "[o]ur pricing and Ortho's pricing has increased due to raw material cost going up, our new manufacturing facility, and hiring of more employees." Pls. SOF ¶ 264. On April 5, 2007, John Kingsbury, a "Co–Leader" of Ortho's implementation team for OCV, forwarded an email to several Ortho employees, attaching a news article on the growth of Immucor's stock since 2001 and commented, "[a]mazing what we started years ago would make [Immucor] which was

near bankruptcy, come so far." Pls. SOF ¶ 232.

On December 7, 2007, Ortho adopted a 75% price increase on TBRs prices by 75%, slated for March 2008. SOF ¶¶ 504, 511, 515. During the period prior to the 2008 price increase, Immucor remained focused on Ortho's price planning. Immucor initially adopted a strategy aimed at delaying a 2008 price increase to capture customers from Ortho. SOF ¶¶ 583, 591. Despite this strategy, in January 2008, De Chirico was informed that Ortho allegedly told a customer Immucor would be following Ortho's price increase because "Immucor always follows us." Pls. SOF ¶ 18. De Chirico replied, "This is good." Pls. SOF ¶ 18. At the end of January, De Chirico stated in an internal email that "[he was] asking Marketing to prepare by day end a List Price that mirrors Ortho's." Pls. SOF ¶ 17.

On March 24, 2008, the same month Ortho's price increase became effective, Immucor announced its price increase on non-group purchasing organization customers, effective July 1, 2008. SOF ¶¶ 594, 615. Immucor's List and Market tier prices were equivalent to Ortho's List and Market/Discounted prices. SOF ¶ 606. As a 2008 Immucor Market Trends report put it "[f]or the past 8 years, a duopoly has existed in the [TBR] marketplace," and this "[l]imited competition ... has allowed pricing to be raised with little ramifications from the marketplace." Pls. SOF ¶ 41.

However, employees at Ortho and Immucor expressed reservations about upsetting the relationship the two companies had formed. In an internal September 18, 2007 email, Kevin Crittenton, an Immucor Regional Sales Manager, wrote "[i]f we are into (sic) careful we can get into a price war with Ortho." Pls. SOF ¶ 234. An internal Ortho memorandum, which references

financial results from 2005, stated "[t]here are no real winner[s] in war—especially a price war." Pls. SOF ¶ 235. DeMezzo, an Immucor Regional Manager, wrote in a September 17, 2008 email regarding the possible publication of a competitive bid on proprietary reagents to an Ortho customer, "We cannot post a BID in the paper like that .... [I]f we list like that Ortho will pitch a fit and we could really upset the apple cart." Pls. SOF ¶ 236. Finally, Kingsbury, an Ortho Co–Leader of the OCV implementation team stated that "[a]mazing what we started years ago would make [Immucor] which was near bankruptcy, come so far." Pls. SOF ¶ 232.

References to averting price wars, like the use of the term "truce," are not evidence of collusion. *See Baby Food*, 166 F.3d at 120–21. In *Baby Food*, plaintiffs relied on (1) an internal defendant memorandum in which an employee referred to "our truce" and (2) one manufacturer's unwillingness to enter into new markets, along with other evidence. *Id.* at 119–21. A manager at one of the defendants stated a move "should abate the war. We don't want to start it again." *Id.* at 121. The references to a "price war" and "upset[ting] the apple cart" in this case closely resemble the references made in *Baby Food*. Accordingly, these statements, even when considered with the 2001 and 2005 evidence, do not raise an inference of collusion. The internal communications referenced by plaintiffs merely reflect an awareness of the duopolistic nature of the TBR market.

Viewed in the light most favorable to plaintiffs, plaintiffs have not presented sufficient evidence to tend to exclude the possibility that the 2008 price increase was the product of interdependent behavior.

### G. "Plus Factors"—Conclusion

After an assessment of the "plus factors," the Court concludes that plaintiffs presented sufficient traditional conspiracy evidence to defeat summary judgment as to their claims based on the 2001 price increase. However, plaintiffs' traditional conspiracy evidence concerning the 2005 and 2008 price increases "is as consistent with interdependence as with a conspiracy, and as such, it does not tend to exclude the possibility that" Ortho and Immucor acted lawfully. *See Chocolate*, 801 F.3d at 412. With respect to the 2005 and 2008 price increases, although the Court concludes that Ortho had a motive to enter into a conspiracy and that all of the price increases were actions contrary to its interest, those "factors are neither necessary nor sufficient to preclude summary judgment, at least where the claim is price fixing among oligopolists." *Chocolate*, 801 F.3d at 398. "That leaves traditional non-economic evidence of a conspiracy as the most important plus factor in cases like this one." *Id.* Because the Court "cannot infer too much from mere evidence of parallel pricing among oligopolists," *Chocolate*, 801 F.3d at 397, the Court grants Ortho's Motion for Summary Judgment as to the 2005 and 2008 price increases.

The Court considers this conclusion on liability to be separate from a determination of the damages period. As Ortho states in its Reply Memorandum,

> Nor is it sufficient for Plaintiffs to argue that the 2001 price increases had an effect that persisted throughout the class period. While that argument, if credited, might address the class certification issues of common impact and damages, it does not resolve the distinct liability issue of whether there was any unlawful price coordination beyond 2001.

Ortho's Reply Br. at 9. As Judge Baylson observed in *Domestic Drywall*, "[t]he parties should not confuse this [conspiracy period] window with the possibly different time period for the calculation of damages. It is possible that [plaintiffs] may be able

to prove damages for a broader time period than the scope of discovery and liability." *In re Domestic Drywall Antitrust Litig.*, No. 13-2437, 2016 WL 3453147, at *4 n.5 (E.D. Pa. June 22, 2016).

### H. Fraudulent Concealment

Finally, Ortho argues that, as a matter of law, recovery of antitrust damages for plaintiffs' purchases prior to May 18, 2005 is barred by the applicable four-year statute of limitations under the Sherman Act. Ortho contends that plaintiffs (1) were or should have been aware of the facts underlying their claims prior to the expiration of the statute of limitations period and (2) did not exercise reasonable diligence. Those arguments present genuine dispute of material facts sufficient to require denial of the Motion for Summary Judgment on the issue of fraudulent concealment.

The first of plaintiffs' Complaints in this matter was not filed until May 18, 2009. *See* Compl., *Warren Gen. Hosp. v. Immucor, Inc.*, No. 2:09–cv–02391, ECF No. 1, 2009 WL 3071376 (D.N.J. May 18, 2009). As a result, plaintiffs' claims for antitrust damages for purchases prior to May 18, 2005 would ordinarily be barred by the four-year statute of limitations under the Sherman Act. However, plaintiffs invoke the fraudulent concealment doctrine in an effort to toll the statute of limitations and recover damages that would otherwise be deemed unrecoverable.

#### 1. Applicable Law

 Sherman Act Section 1 claims are subject to a four-year statute of limitations. *See* 15 U.S.C. § 15b ("Any action to enforce any cause of action under section 15 ... of this title shall be forever barred unless commenced within four years after the cause of action accrued."). "Although § 15b mandates a four-year statute of limitations for civil antitrust actions, it is well established that the doctrine of fraudulent concealment tolls the limitations period

when a plaintiff's cause of action has been obscured by the defendant's conduct." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 160 (3d Cir. 2002). "When plaintiffs seek to demonstrate a case for equitable tolling, and defendants seek summary judgment on the issue,

> [A] court must determine (1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their ... claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, *and* (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint."

*Forbes v. Eagleson*, 228 F.3d 471, 486–87 (3d Cir. 2000); *see also Linerboard*, 305 F.3d at 160. "At the summary judgment stage, the plaintiff must come forward with evidence to support each of these prerequisites." *In re Aspartame Antitrust Litig.*, 416 Fed.Appx. 208, 211 (3d Cir. 2011).

#### 2. Discussion

Ortho does not address the affirmative acts of concealment prong at this stage. Instead, Ortho contends that plaintiffs were or should have been aware of the facts supporting their claim prior to May 18, 2005, and that plaintiffs did not exercise reasonable diligence.

##### a. Awareness of Facts Supporting Claim

 Ortho argues that a statement by a class member and member of the GPO Novation and various statements by non-plaintiff Michael Conway support the conclusion that plaintiffs should have been aware of the facts supporting their claim

prior to May 18, 2005. The Court disagrees and concludes there is sufficient evidence to raise a genuine dispute as to whether plaintiffs were not and should not have been aware of the facts supporting their claim prior to May 18, 2005.

In September 2004, a class member and member of Novation questioned whether Ortho and Immucor were engaged in price-fixing because they were the only two companies in the market and raised prices simultaneously. SOF ¶ 677. Non-class member Conway's statements in posts on a public forum, included a post on January 31, 2005: "Maybe it is time now to go to the FDA and complain but to the Federal Trade Commission and ask them if this is a[n] unfair monopolistic trade on the part of the two major players." Mot. for Summ. J., Ex. 430, at 395. Other messages on public forums questioned whether there was collusion in the TBR industry and the FTC would become involved. SOF ¶ 651. Ortho also states that plaintiffs knew about the duopolistic nature of the TBR market, the price increases in 2001 and 2005, and the 2004 GPO contract cancellations prior to May 18, 2005.

For equitable tolling to apply, plaintiffs must present evidence that they were not aware or should not have been aware of the facts supporting their conspiracy claim prior to May 18, 2005. *See Forbes*, 228 F.3d at 487 ( [A] court must determine ... whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.") "[T]he issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the named plaintiffs and the members of each of the classes knew of the alleged conspiracy among defendants." *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999). "Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it." *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979).

While plaintiffs had knowledge of the price increases in 2001 and 2005 and the 2004 GPO contract cancellations, the duopolistic nature of the TBR market limited plaintiffs' ability to accurately identify the facts supporting their claims. The evidence surrounding the 2000 AABB meeting and lunch between Ortho and Immucor employees was in the control of Ortho and Immucor. Similarly, the subsequent communications between Ortho and Immucor employees, as well as the intra-corporate communications that plaintiffs now highlight, were not publicly available. Without access to this crucial information, plaintiffs could rightly construe the increases and contract cancellations as the product of interdependent behavior. In fact, Ortho argues strongly that the actions were products of interdependent behavior and not collusion.

While Ortho contends that statements by one class member and non-class member Conway indicate that plaintiffs should have been aware of the facts underlying their complaint prior to the expiration of the limitations period, Ortho's evidence of Internet public forum posts does not show that they were widely circulated. There is a genuine dispute of material fact as to whether plaintiffs had notice of the referenced posts and whether the posts rise beyond mere speculation. Internet postings by potentially unreliable sources do not establish that plaintiffs should have been aware of the facts supporting their claim.

Plaintiffs also identify a "triggering event" that put them on notice of the existence of their claim. *See In re Aspartame Antitrust Litig.*, No. 06-CV-1732-LDD, 2008 WL 4724094, at *7 (E.D. Pa. Aug. 11, 2008); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (identifying the guilty plea of a defendant as a triggering event that put plaintiffs on notice; *In re Electric Carbon Prods. Antitrust Litig.*, 333 F.Supp.2d 303, 315 (D.N.J. 2004) (identifying the indictment of certain defendants by the Department of Justice as an event that put plaintiffs on notice of their claim). In this case, after the Department of Justice announced its investigation of the TBR market in May 2009, plaintiffs contend that their perception of Ortho's and Immucor's actions changed. Plaintiffs filed their first suit soon after that announcement.

Plaintiffs had knowledge of the 2001 and 2005 price increases and the 2004 GPO contract cancellations prior to the expiration of the statute of limitations, but they did not have access to information about communications between Ortho and Immucor or intra-corporate communications. Moreover, plaintiffs identify a clear triggering event in May 2009—the announcement of an investigation by the Department of Justice—that led to the filing of their suits against Ortho and Immucor. The Court concludes that, at the summary judgment stage, plaintiffs have met their burden in establishing that they did not know or should not have been aware of the facts underlying their claim prior to May 18, 2005.

### b. Reasonable Diligence

■ Plaintiffs contend that they engaged in reasonable diligence by inquiring about price increases and relying on Ortho's and Immucor's explanations. The Court concludes that plaintiffs have presented sufficient evidence of reasonable diligence to avoid judgment as a matter of law.

Tolling "requires a level of diligence on the part of the plaintiff ... to take reasonable measures to uncover the existence of injury." *Forbes*, 228 F.3d at 486. In the context of antitrust cases, the purpose of the fraudulent concealment doctrine is to compensate victims but also to encourage diligent investigation "and thereby to uncover unlawful activity." *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-02002, 2011 WL 5980001, at *4 (E.D. Pa. Nov. 30, 2011). However, "[r]easonable due diligence does not require a plaintiff to exhaust all possible avenues of inquiry. Nor does it require the plaintiff to actually discover his injury." *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 256 (3d Cir. 2001). "The more ominous the [storm] warnings, the more extensive the expected inquiry." *See Processed Egg*, 2011 WL 5980001, at *14.

Ortho and Immucor both developed explanations for their price increases, including references to increased costs of raw materials and greater regulatory burdens. Pls. SOF ¶ 270. Plaintiffs' ability to determine whether these explanations were accurate was limited. Pls. SOF ¶ 271 ("Q. At the time of the price increases, did either of the Schuylkill hospitals have access to information about raw material costs for the manufacture of blood reagents? A. I don't believe so." Jennifer Reedy Dep.) While such statements did not absolve plaintiffs of reasonable diligence, they did limit plaintiffs' ability to determine whether "storm warnings" existed.

The duopolistic nature of the TBR market diminished the impact of the price increases and contract cancellations as warnings of collusive behavior that would merit greater investigation. Plaintiffs provide evidence of numerous inquiries by individual plaintiffs to Ortho and Immucor

as to the price increases. Pls. SOF ¶¶ 285, 289, 294–95, 304–05, 310–12, 317–19, 322, 327–28, 336–38. Plaintiffs had no opportunity in the period prior to May 18, 2005, to compare prices as the TBR market was a duopoly. Ortho proposes no additional steps that plaintiffs could have taken to determine whether its conduct was the result of lawful interdependent behavior or collusion. "The point at which a reasonable person would have appreciated the need for diligent inquiry, or whether a resulting investigation would have produced useful results, are ultimately questions of fact for a juror to decide." *In re Sulfuric Acid Antitrust Litig.*, 743 F.Supp.2d 827, 856 (N.D. Ill. 2010); *see also Morton's Mkt.*, 198 F.3d at 832 ("[A]s a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment."). The Court concludes that the evidence offered by plaintiff precludes the entry of summary judgment on the issue of reasonable diligence.

## VI. CONCLUSION

For the foregoing reasons, the Court denies Ortho's Motion for Summary Judgment as to plaintiffs' claims based on the 2001 price increase but grants the Motion as to plaintiffs' claims based on the 2005 and 2008 price increases. The Court denies the Motion as to the issue of fraudulent concealment, allowing plaintiffs' claims based on the 2001 price increase to proceed to trial. An appropriate order follows.